# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | |
|---|---|
| **PAULA S. OSBORNE,** ) | |
| Plaintiff ) | |
| ) | |
| v. ) | Civil Action No. 2:07cv00070 |
| ) | **REPORT AND** |
| ) | **RECOMMENDATION** |
| **MICHAEL J. ASTRUE**, ) | |
| **Commissioner of Social Security,** ) | By: PAMELA MEADE SARGENT |
| Defendant ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Paula S. Osborne, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423, 1381 *et seq*. (West 2003 & Supp. 2008). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more

-1-

than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Osborne protectively filed her applications for DIB and SSI on April 7, 2005, alleging disability as of August 28, 2004,[1] based on headaches, blackouts, fibromyalgia, hyperinsulinemia,[2] swelling, pelvic pain and dizziness. (Record, ("R."), at 56-58, 61, 96, 117, 353-55.) The claims were denied initially and upon reconsideration. (R. at 40-42, 46, 47-49, 357-59.) Osborne then requested a hearing before an administrative law judge, ("ALJ"). (R. at 50.) The ALJ held a hearing on February 12, 2007, at which Osborne was represented by counsel. (R. at 371-90.)

By decision dated March 23, 2007, the ALJ denied Osborne's claims. (R. at 19-26.) The ALJ found that Osborne met the disability insured status requirements of the Act for DIB purposes through December 31, 2007. (R. at 21.) The ALJ found that Osborne had not engaged in substantial gainful activity since August 28, 2004. (R. at 21.) The ALJ also found that the medical evidence established that Osborne suffered from severe impairments, namely obesity, history of blackout spells, fibromyalgia, headaches, back pain, hyperinsulinemia, swelling, pelvic pain, anxiety

---

[1] At her hearing, Osborne amended her applications to reflect an alleged onset date of disability of August 28, 2004, rather than June 1, 2004. (R. at 373.)

[2] Hyperinsulinemia is the presence of an excessive amount of insulin in the blood. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 794 (27th ed. 1988.)

-2-

and depression, but he found that Osborne did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 21-22.) The ALJ found that Osborne had the residual functional capacity to perform light work[3] that would not expose her to working around dangerous machinery and at unprotected heights. (R. at 22.) The ALJ also found that Osborne was restricted as assessed by B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist. (R. at 22, 287-95.) Thus, the ALJ concluded that Osborne was capable of performing her past relevant work as a pharmacy technician and an assistant retail store manager. (R. at 25.) In addition, based on Osborne's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that she could perform, including those of a hand packer, a sorter, an assembler, an inspector, a cashier, a sales clerk, an information clerk and a greeter/hostess. (R. at 25.) Therefore, the ALJ concluded that Osborne was not disabled under the Act and was not eligible for DIB or SSI benefits. (R. at 25-26.) *See* 20 C.F.R. §§ 404.1520(f), (g), 416.920(f), (g) (2008).

After the ALJ issued his decision, Osborne pursued her administrative appeals, (R. at 14), but the Appeals Council denied her request for review. (R. at 9-11.) Thereafter, on December 4, 2007, the Appeals Council set aside its earlier action to consider additional evidence submitted by Osborne. (R. at 5-8.) However, after reviewing this additional evidence, the Appeals Council again denied Osborne's

---

[3]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, she also can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2008).

request for review. (R. at 5-8.) Osborne then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2008). The case is before this court on Osborne's motion for summary judgment filed May 29, 2008, and the Commissioner's motion for summary judgment filed June 23, 2008.

## *II. Facts*

Osborne was born in 1966, (R. at 56, 353, 374), which classifies her as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). She obtained her general equivalency development, ("GED"), diploma and has clerical vocational training. (R. at 124, 374.) Osborne has past relevant work as an assistant manager and a pharmacy technician. (R. at 73, 76, 126, 375-76.)

Osborne testified that she could walk for up to 30 minutes without interruption. (R. at 377-78.) She stated that she had been dealing with depression for the past six or seven months due to her parents' illnesses. (R. at 380.)

Donna Bardsley, a vocational expert, also was present and testified at Osborne's hearing. (R. at 386-88.) Bardsley testified that Osborne's past relevant work as a pharmacy technician was light and unskilled and her work as an assistant retail store manager was light and skilled. (R. at 386.) Bardsley was first asked to consider an individual of Osborne's height, weight, education and work experience who had the residual functional capacity to perform light work that did not require working around hazardous machinery or at unprotected heights and who was limited as indicated by

-4-

Lanthorn's assessment. (R. at 293-95, 386-87.) Bardsley testified that such an individual could perform the jobs of a hand packager, a sorter, an assembler, an inspector, a cashier, a sales clerk, an information clerk, a hostess and a greeter. (R. at 387.)

In rendering his decision, the ALJ reviewed records from Clinch River Health Services; St. Mary's Outpatient Clinic; Mountain View Regional Medical Center; University of Virginia Health System; Dr. Michael J. Hartman, M.D., a state agency physician; Dr. Randall Hays, M.D., a state agency physician; Julie Jennings, Ph.D., a state agency psychologist; Joseph Leizer, Ph.D., a state agency psychologist; Wise County Behavioral Health Services; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; Dr. Marie Stemple, M.D.; and Family Drug Center. Osborne's attorney also submitted medical records from Medical Associates of Southwest Virginia to the Appeals Council.[4]

Osborne received treatment at Clinch River Health Services from July 21, 2003, through August 25, 2004, for various complaints such as fibromyalgia, chronic pelvic pain, multiple chemical sensitivities, headaches, morbid obesity, cholelithiasis, urinary tract infections, nausea and vomiting, left wrist sprain, tracheitis,[5] hair loss, bacterial vaginitis, bilateral leg pain, edema in the feet and ankles, bladder pressure and cystitis. (R. at 152-72.) A series of x-rays performed in August 2003 of Osborne's right hip,

---

[4]Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 5-8), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

[5]Tracheitis is an inflammation of the trachea. *See* Dorland's at 1738.

-5-

lumbar spine, pelvis, cervical spine, left shoulder and thoracic spine showed no abnormalities other than mild degenerative changes of the thoracic spine. (R. at 204, 206-08, 211-12.)

Osborne received treatment at St. Mary's Outpatient Clinic from September 20, 2004, through May 23, 2005. (R. at 173-203.) During this time, Osborne complained of headaches, blackouts, dizziness, bilateral hip pain, bilateral foot and leg pain, continuous pain all over secondary to fibromyalgia, bilateral leg edema, chronic pelvic pain, nervousness, hyperinsulinemia, left lower leg cellulitis, dysuria, gallstones, lower back pain, depression and flank pain. (R. at 173-203.) In September 2004, Osborne complained of dizziness, headaches and severe pain. (R. at 184.) Examination showed no limitations. (R. at 185.) On October 26, 2004, a CT scan of Osborne's abdomen showed cholelithiasis with multiple large stones and diminished liver weakness consistent with fatty infiltration. (R. at 187.) On February 9, 2005, Osborne had bilateral edema of her legs, but was grossly intact with no focal neurological deficits. (R. at 177.) She was again noted to have no functional limitations. (R. at 177.) On August 16, 2005, an x-ray of Osborne's lumbar spine showed no abnormalities. (R. at 223, 340.)

On April 17, 2005, Osborne presented to Mountain View Regional Medical Center, ("Mountain View"), for complaints of an ankle injury. (R. at 217-19.) X-rays of Osborne's left knee and ankle showed no acute fracture. (R. at 217, 341.) She was diagnosed with a ligamentous sprain of the left knee and ankle. (R. at 218.) A follow-up study showed no deep venous thrombosis. (R. at 224.) On August 16, 2005, Osborne presented to Mountain View for complaints of low back pain. (R. at 213-16.)

-6-

She had severe tenderness to palpation in her lumbar area. (R. at 214.) X-rays of Osborne's lumbar spine were negative for a fracture. (R. at 214.) She was diagnosed with lumbar strain. (R. at 214.)

On April 29, 2005, Osborne was evaluated at University of Virginia Health System, ("University of Virginia"), for hyperinsulinemia. (R. at 232-35.) She had full motor strength and normal gait, with some erythema and tenderness of the right calf. (R. at 234.) Testing showed that Osborne was insulin resistant. (R. at 235.) On May 5, 2005, Osborne was seen at the University of Virginia for evaluation of cholelithiasis. (R. at 227-31.) She reported experiencing fainting spells, but stated that she had experienced only five or six episodes in the previous two years. (R. at 228.) Dr. Kathryn F. Hatch, M.D., reported that most of Osborne's medical problems stemmed from her obesity. (R. at 228.) She recommended that Osborne undergo gastric bypass surgery. (R. at 228.)

On July 20, 2005, Dr. Michael J. Hartman, M.D., a state agency physician, indicated that Osborne had the residual functional capacity to perform light work. (R. at 239-46.) Dr. Hartman reported that Osborne could occasionally climb ramps, stairs and ladders, balance, stoop, kneel, crouch and crawl. (R. at 241.) He indicated that Osborne should never climb ropes or scaffolds. (R. at 241.) No manipulative, visual or communicative limitations were noted. (R. at 241-42.) He indicated that Osborne should avoid all exposure to work hazards. (R. at 242.) This assessment was affirmed by Dr. Randall Hays, M.D, another state agency physician, on October 11, 2005. (R. at 243.)

On July 21, 2005, Julie Jennings, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Osborne suffered from a nonsevere affective disorder. (R. at 247-60.) Jennings indicated that Osborne was mildly limited in her activities of daily living, in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 257.) Jennings also noted that Osborne had not experienced any episodes of decompensation. (R. at 257.) This assessment was affirmed by Joseph Leizer, Ph.D., another state agency psychologist, on October 11, 2005. (R. at 247.)

On September 16, 2005, Osborne was seen at Wise County Behavioral Health Services for complaints of depression. (R. at 261-86, 296-310.) James Kegley, M.S., diagnosed major depressive disorder. (R. at 280, 308.) He indicated that Osborne had a then-current Global Assessment of Functioning, ("GAF"), score of 50.[6] (R. at 280, 308.) He also indicated that Osborne's highest and lowest GAF score within the prior six months was 50. (R. at 280, 308.)

On October 25, 2005, Osborne saw Dr. Marie Stemple, M.D., for complaints of head and chest congestion. (R. at 337.) Osborne reported that her depression was doing well. (R. at 337.) She reported that she was not taking Cymbalta and that she did not need any medication. (R. at 337.) Dr. Stemple reported that Osborne's legs were puffy with minimal pitting edema. (R. at 336.) On November 22, 2005, Osborne

---

[6]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning ...." DSM-IV at 32.

reported that her symptoms of depression were "okay." (R. at 334.) On December 20, 2005, Osborne reported that her depression was doing well. (R. at 331.) On February 14, 2006, Osborne again reported that her depression was doing well. (R. at 328.) On April 11, 2006, Osborne reported that her depression was stable and that she had no problems with anxiety. (R. at 325.) On June 6, 2006, Osborne reported that her depression was stable. (R. at 322.) On August 4, 2006, Osborne complained of pain in her left lower extremity. (R. at 319.) An ultrasound venous doppler showed no evidence of deep venous thrombosis. (R. at 338.) On October 6, 2006, Osborne reported that she was on medication for her depression. (R. at 313.) She reported that she became a "little anxious" and felt "stressed at times." (R. at 313.) Dr. Stemple reported that Osborne's legs were puffy, but there was no pitting edema. (R. at 313.)

On September 19, 2006, Osborne was evaluated by B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist. (R. at 287-92.) Lanthorn reported that Osborne's mood was predominantly depressed with signs of anxiety, noting a mild tremulousness of her hands. (R. at 289.) Lanthorn diagnosed generalized anxiety due to chronic physical problems, major depressive disorder, single episode, mild or greater, and pain disorder associated with psychological factors and general medical conditions. (R. at 291.) He assessed her then-current GAF score at 55.[7] (R. at 291.) Lanthorn reported that it seemed unlikely that Osborne could function effectively in a simple and repetitive job. (R. at 292.)

Lanthorn completed a mental assessment indicating that Osborne had mild

---

[7]A GAF score of 51-60 indicates that the individual has "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning ...." DSM-IV at 32.

-9-

limitations in her ability to interact with the public, supervisors and co-workers. (R. at 293-95.) He also reported that Osborne had moderate limitations in her ability to understand, remember and carry out detailed instructions, to make judgments on simple work-related decisions, to respond appropriately to work pressures and to respond appropriately to changes in a routine work setting. (R. at 293-94.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2008); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2008).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in

the national economy.  *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2008); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated March 23, 2007, the ALJ denied Osborne's claims. (R. at 19-26.)  The ALJ found that the medical evidence established that Osborne suffered from severe impairments, namely obesity, history of blackout spells, fibromyalgia, headaches, back pain, hyperinsulinemia, swelling, pelvic pain, anxiety and depression, but he found that Osborne did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 21-22.) The ALJ found that Osborne had the residual functional capacity to perform light work that would not expose her to working around dangerous machinery and at unprotected heights. (R. at 22.)  The ALJ also found that Osborne was restricted as assessed by psychologist Lanthorn. (R. at 22, 287-95.)  Thus, the ALJ concluded that Osborne was capable of performing her past relevant work as a pharmacy technician and an assistant retail store manager.  (R. at 25.)  In addition, based on Osborne's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that she could perform, including those of a hand packer, a sorter, an assembler, an inspector, a cashier, a sales clerk, an information clerk and a greeter/hostess. (R. at 25.) Therefore, the ALJ concluded that Osborne was not disabled under the Act and was not eligible for DIB or SSI benefits.  (R. at 25-26.) *See* 20 C.F.R. §§ 404.1520(f), (g), 416.920(f), (g).

As stated above, the court's function in the case is limited to determining

whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Osborne argues that the ALJ's decision is not based on substantial evidence of record. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 7-12.) In particular, Osborne argues that the ALJ erred in ignoring the state agency physicians' opinions as to her postural limitations. (Plaintiff's Brief at 8.) Osborne also argues that the ALJ erred in finding that she had the residual functional capacity to perform light work that did not require her to work around dangerous

machinery and unprotected heights with the nonexertional limitations assessed by Lanthorn. (Plaintiff's Brief at 8-11.)

Osborne argues that the ALJ erred in ignoring the state agency physicians' opinions as to her postural limitations. (Plaintiff's Brief at 8.) The ALJ found that Osborne had the residual functional capacity to perform light work that would not expose her to working around dangerous machinery and at unprotected heights. (R. at 22.) Dr. Hartman and Dr. Hays also found that Osborne could not climb ladders, ropes or scaffolds and could occasionally climb ramps and stairs, balance, stoop, crouch, crawl and kneel. (R. at 241.) While the ALJ did not specifically mention these additional limitations, I find that substantial evidence exists to support his finding with regard to Osborne's residual functional capacity.

Social Security Ruling 85-15 states that stooping, kneeling, crouching and crawling are progressively more strenuous forms of bending parts of the body. *See* S.S.R. 85-15, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings 1983-1991 (West 1992). Social Security Ruling 83-14 states that most light jobs require no crouching and only occasional stooping. *See* S.S.R. 83-14, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings 1983-1991 (West 1992). Similarly, S.S.R. 85-15 notes that some stooping, which is defined as bending the body downward and forward by bending the spine at the waist, is required to do almost any kind of work. *See* S.S.R. 85-15, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings 1983-1991. If a person can stoop occasionally, which is defined as from very little up to one-third of the time, the sedentary and light occupational base is virtually intact. *See* S.S.R. 85-

-13-

15, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings 1983-1991. This also is true for crouching, which is defined as bending the body downward and forward by bending both the legs and spine. *See* S.S.R. 85-15, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings 1983-1991. Crawling on hands and knees and feet is a relatively rare activity even in arduous work, and limitations on the ability to crawl would be of little significance in the broad world of work. *See* S.S.R. 85-15, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings 1983-1991. This also is true of kneeling, which is defined as bending the legs at the knees to come to rest on one or both knees. *See* S.S.R. 85-15, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings 1983-1991.

Here, the jobs previously performed by Osborne and those enumerated by the vocational expert were all at the light level of exertion. (R. at 386-87.) That being said, it is clear that the ALJ's restricting Osborne to the performance of light work took into account the postural limitations identified by the state agency physicians.

To the extent that Dr. Hartman and Dr. Hays were considering Osborne's blackouts in restricting her ability to climb ramps and stairs, balance or perform other postural activities, their restriction was generous based on the minimal evidence of record. In May 2005, Osborne reported that she had experienced only five or six blackouts over the previous two years. (R. at 228.) In September 2006, she reported having no blackouts since 2003. (R. at 289.) No treating or examining physician has diagnosed a medically determinable impairment that caused Osborne's alleged blackouts. Diagnostic testing, including a CT scan, found no basis for her symptoms.

-14-

(R. at 209.) Given the minimal evidence of record related to Osborne's blackouts, the restrictions described by Dr. Hartman and Dr. Hays were generous and still would not prevent the performance of light work. The record indicates that Osborne had no functional limitations arising from her impairments. (R. at 177, 185.) X-rays have shown no significant abnormalities. (R. at 204, 206, 211-12, 214.) Neurological examinations have been normal. (R. at 177, 328.) Based on this, I find that the state agency physicians' assessments are consistent with the ALJ's restriction of Osborne to light work.

Osborne further argues that the ALJ erred by finding that she could perform a significant number of jobs despite her mental impairment. (Plaintiff's Brief at 8-11.) Osborne argues that remand is required because Lanthorn opined that it was unlikely that Osborne could function effectively even in a simple and repetitive job. (R. at 292; Plaintiff's Brief at 10.) The only examining mental health professional to assess Osborne's mental limitations was Lanthorn. The ALJ adopted all of the specific functional limitations described by Lanthorn. (R. at 22, 24-25.) The ALJ instructed the vocational expert to consider all such limitations, and the vocational expert testified that an individual with the functional limitations described by Lanthorn could perform jobs that existed in significant numbers in the economy. (R. at 387.) The question of whether a claimant can work is a vocational issue, not a medical issue. *See* 20 C.F.R. §§ 404.1527(e), 416.927(e) (2008). Remarks by medical sources that address the ultimate issue of whether a claimant can work are not medical opinions and are not entitled to consideration under the procedures described in 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2008).

Furthermore, Lanthorn's assessment of Osborne's GAF score suggests that he believed Osborne was capable of working at some level. Lanthorn assessed a GAF score of 55, indicating moderate symptoms or moderate difficulty in social, occupational or school functioning. (R. at 291.) In addition, two state agency psychologist concluded that Osborne had no severe mental impairments. (R. at 247-60.) Likewise, according to treatment notes, Osborne experienced only mild and intermittent depression. Osborne stopped taking Cymbalta in October 2005 because she was "doing well" overall and did not feel that she needed antidepressant medication. (R. at 337.) She denied problems with her depression in December 2005. (R. at 331.) Her depression remained stable, and she again reported no depression in February and April 2006. (R. at 325, 328.) Based on this, I find that substantial evidence exists to support the ALJ's finding with regard to Osborne's mental residual functional capacity.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists to support the Commissioner's residual functional capacity finding;

2. Substantial evidence exists to support the ALJ's finding that a significant number of jobs exist in the economy that Osborne could perform; and

3. Substantial evidence exists to support the Commissioner's finding that Osborne was not disabled under the Act.

Case 2:07-cv-00070-JPJ-PMS   Document 15   Filed 08/21/08   Page 16 of 18   Pageid#: 71

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Osborne's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006):

> Within ten days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 10 days could waive appellate review. At the conclusion of the 10-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Chief United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED: This 21st day of August 2008.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE